IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INELL M. FOYE | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-2933 |
| PRIME CARE MEDICAL, INC., ET AL. | : | |

## MEMORANDUM

**SURRICK, J.**                                                         APRIL  14 , 2015

Presently before the Court are Defendants Warden Dale Meisel and County of Lehigh's

Motion for Summary Judgment  (Meisel Mot. Summ. J., ECF No. 55), and Defendants

PrimeCare Medical, Inc., Josie Bahnick, R.N., and Dr. Erik Von Kiel, D.O.'s Motion for

Summary Judgment (PrimeCare Mot. Summ. J., ECF Nos. 56, 57, 58), as well as exhibits and

Plaintiff's response thereto (Pl.'s Resp., ECF No. 61).  For the following reasons, the Motions

will be granted.

## I.    BACKGROUND

### A.    Factual Background

On the evening of August 13, 2008,[1] Plaintiff Inell Foye was struck in the head with a

golf club during an assault and attempted robbery in Allentown, Pennsylvania.  (Foye Dep., ECF

No. 55-2 at 76-77.)  Plaintiff sustained a laceration to the left side of his head as a result of the

attack.  (Sacred Heart Medical Records, Pl.'s Resp. Ex. A at 00022.)  Following the attack,

---

[1] Plaintiff's submissions suggest he was attacked on either August 14 or August 18, 2008.
(Second Am. Compl. ¶ 20, ECF No. 29; Pl.'s Resp. 3.)  Medical records, however, indicate he
was admitted to Sacred Heart Hospital for care related to the attack on August 14, 2008.
(Discharge Summary, PrimeCare Mot. Ex. B at P1.)  Further documentation confirms that the
actual injury occurred on the night of August 13, 2008.  (Ellenberger Ltr., PrimeCare Mot. Ex. E
at 2.)

Plaintiff was admitted to Sacred Heart Hospital in Allentown ("Sacred Heart"), and evaluated by medical staff.  (*Id*.)  Although Plaintiff was upset and anxious after the events of the evening, he was in stable physical condition, and remained conscious and alert at all times.  (*Id*.)  Sacred Heart doctors repaired Plaintiff's laceration using staples and sutures, performed a series of radiological tests, and treated Plaintiff with several medications to prevent infection and alleviate his pain.  (*Id*. at 00023-00024.)

Over the course of the next several days, Plaintiff discussed options for further treatment with Ghodrat Daneshdoot, M.D., a neurosurgeon associated with Sacred Heart.  (*Id*. at 00039.)  After considering the available options, Plaintiff elected to undergo surgery to remove a depressed skull fracture and repair affected areas.  (*Id*.)  On August 18, 2008, surgeons performed a craniectomy, removing the depressed skull fracture, as well as bone shards that could potentially damage Plaintiff's brain and necrotic brain tissue.  Surgeons subsequently performed a duraplasty and cranioplasty.  (*Id*.)  According to doctors, the surgery was "uneventful."  (*Id*. at 00132.)

Following surgery, Plaintiff was transferred to Sacred Heart's Intensive Care Unit for recovery, and both a CT scan and an MRI showed edema and swelling present in the area of the surgery.  (*Id*. at 00039.)  Among the symptoms Plaintiff experienced at this point were hesitancy of expression and occasional slurred speech, though neurological exams showed no serious problems or deficits.  (*Id*.)  Prior to being discharged on August 26, 2008, Plaintiff was prescribed Dilantin, a prescription medication to prevent seizures, as a prophylactic measure for a

period of six to twelve months.[2]  (*Id.*)  Plaintiff was also told to return in one month for a repeat MRI.  (*Id.*)  Plaintiff's radiologist, Paul DuPont, M.D., recommended a "6 month follow-up" to assess any potential changes in the size of Plaintiff's pineal gland region.  (*Id.* at 00160.)

Plaintiff's condition gradually improved over the course of subsequent months.  (Foye Dep. 21; Pl.'s Resp. 4.)  Although Plaintiff's speech problems disappeared, Plaintiff still experienced pain, migraines, and dizziness.  (Foye Dep. 22; Pl.'s Resp. 5.)  Plaintiff did not suffer from any seizures during this period.  (PrimeCare Mem. 3.)  Nevertheless, Plaintiff's symptoms affected his regular activities, and he had difficulty sleeping, standing, and driving. (Foye Dep. 22-23.)  However, Plaintiff did not follow up with medical professionals regarding to these symptoms.  (LCP Medical Records, Prime Care Mem. Ex. C at 14.)

On February 11, 2009, Plaintiff was sent to Lehigh County Prison ("LCP") following his arrest on drug charges.  (Foye Dep. 13.)  Plaintiff's incarceration was lengthy.  He was ultimately sentenced to a prison term of 9 3/4 to 25 years.[3]  (*Id.*)  At LCP, Plaintiff received an initial medical screening by Megan Hughes,[4] an employee of Defendant PrimeCare, which manages health services for LCP.[5]  (LCP Medical Records 14.)  Plaintiff informed Hughes about his injury

---

[2] Plaintiff was prescribed additional medications for blood pressure issues, hypertension, and depression.  (*Id*. at 00047-48.)

[3] The details of Plaintiff's arrest and subsequent conviction are material only insofar as they establish the duration of his incarceration in Lehigh County Prison.

[4] Hughes is not named as a defendant in this matter, and Plaintiff presumably does not allege that she is a party to the wrongs he claims to have suffered.

[5] Defendant PrimeCare is a private corporation that contracts with Lehigh County to provide medical services to LCP inmates.  Defendants Von Kiel and Bahnick are PrimeCare employees who work at LCP.

and surgery, and told her about his lingering symptoms.  (Foye Dep. 26, 34; LCP Medical

Records 14.)  Plaintiff stated that he had been prescribed various medications, and that he needed

a follow-up MRI, though he could not remember the names of the specific medications he had

been prescribed.  (Foye Dep. 26; LCP Medical Records 14.)  Plaintiff admitted that he did not

regularly comply with the instructions for his medications during the period between his surgery

and incarceration.  He also admitted that he did not follow up with doctors during that time.

(LCP Medical Records 14.)  After obtaining Plaintiff's consent, PrimeCare employees requested,

and subsequently received, the records of Plaintiff's treatment at Sacred Heart.  (*Id.*)

Following his admission to LCP, Plaintiff was assigned to "bottom bunk, bottom tier"

status, due in large part to the residual effects of his injury.  (Foye Dep. 32-33.)  Having been so

designated, Plaintiff was prevented from holding a job in the prison, and his ability to participate

in physical activities with other inmates was limited.[6]  (*Id*. 33.)

Over the course of his first four months at LCP, Plaintiff contacted PrimeCare employees

and prison officials with a variety of complaints.  Plaintiff's complaints touched on a wide range

of topics, from a number of medical problems to issues with his cell environment and bedding.

(*See* Pl.'s Resp. Exs. I-N.)  Plaintiff repeatedly sent Sick Call Requests–the medium by which

LCP inmates typically request medical attention–to PrimeCare employees.  On March 18, 2009,

Plaintiff complained of headaches, and requested that he receive an MRI.  (Pl.'s Resp. Ex. I at 1.)

Plaintiff repeated this request on April 1, 2009, and PrimeCare employees scheduled Plaintiff for

---

[6] In his deposition, Dr. Von Kiel noted that an inmate could be placed on "bottom bunk"
status for "any number of possible" reasons.  He noted the risk of seizure, as well as a possible
handicap, as potential motivating factors for the decision to assign Plaintiff to this status,
although he could not say definitively what the reasoning behind the decision was.  (Von Kiel
Dep., ECF No. 55-3 at 16, 19.)

an appointment with a physician.  (Pl.'s Resp. Ex. J.)  Plaintiff also requested an MRI on April

23, 2009, and another doctor's appointment was scheduled.  (Pl.'s Resp. Ex. K.)  Plaintiff's MRI

requests were frequently made in association with concerns about his headaches and blood

pressure problems.  (*See, e.g.*, *id.*)  Plaintiff's requests and grievances were consistently

addressed by PrimeCare employees.  (Foye Dep. 40, 42.)  In addition, although Plaintiff alleges

problems with how PrimeCare employees responded to his pain needs, he also noted that his pain

issues were generally addressed.[7]  (*Id.* at 46-49.)  According to Plaintiff, the MRI issue is the

basis for the instant dispute.[8]  (*Id.* at 86.)

Plaintiff filed a series of grievances with prison administrators to complain about the fact

that he had not yet received an MRI.  On May 15, 2009, Plaintiff requested relief from

administrators, noting that he had repeatedly asked nurses to schedule the test.  (Pl.'s Resp. Ex.

M.)  Defendant Bahnick responded to this grievance on May 29,[9] and Plaintiff appealed,

reiterating that he had not yet received an MRI.  (Pl.'s Resp. Ex. O.)  On June 11, Defendant

Dale Meisel, in his capacity as Warden of LCP, rejected the appeal for failure to comply with the

---

[7] Throughout the course of his incarceration at LCP, Plaintiff's blood pressure was
checked 33 times.  (Foye Dep. 49.)  Plaintiff was given various medications for pain, including
Tylenol and Ultram.  (Foye Dep. 47.)  He was not continued on anti-seizure medication, but had
no seizures during this period.  (Foye Dep. 54.)

[8] PrimeCare and LCP lacked the facilities to conduct an MRI on prison grounds.  (*See*
Von Kiel Dep. 41-44.)  Therefore, arranging an MRI for a prisoner required coordination with
the schedules of outside medical providers, and involve a number of logistical and security
issues.  (*Id.*)  Nevertheless, only nine days elapsed between Von Kiel's final request that Plaintiff
be evaluated for an MRI, and the procedure itself.

[9] The photocopy of the grievance response provided in the record is largely illegible.

LCP procedural requirements,[10] but noted that Plaintiff had been seen by a physician and that "a consultation for an MRI would occur."[11]  (Pl.'s Resp. Ex. P.)  Plaintiff subsequently re-submitted an appeal, but it was rejected as time-barred.  (Pl.'s Resp. Ex. R.)  Plaintiff claims that Meisel is responsible for making, or overseeing, these decisions.  Meisel does not contest that he is personally involved in investigating and adjudicating grievances.  Indeed, he testified that he is informed of every grievance that is filed. (Foye Dep. 63-64; Meisel Dep. 36.)  In addition, on June 10, 2009, Plaintiff mentioned the MRI issue to an unidentified member of the prison staff ("white shirt").  (Pl.'s Resp. Ex. N.)

On June 10, 2009, Von Kiel requested that Physician Assistant Angela Napolitano evaluate Plaintiff for an MRI.  (LCP Medical Records 7.)  On June 19, Plaintiff received an MRI at an outside facility managed by Cedar Crest Imaging.  (LCP Medical Records 3.)  The results of the MRI showed no new significant damage.  It did indicate the presence of a hematoma and scar tissue.  (Id.)  Specifically, the report indicated that there was "no evidence of residual changes from the prior trauma, no intracranial hemorrhage, [and] cystic changes [to the] pineal gland [had] measurement similar to a prior report."  (Id.)  Defendant's expert, Carl Ellenberger, M.D., opined that Plaintiff "did not suffer any adverse effects by not having an MRI from February 11, 2009 through June 19, 2009."  (Ellenberger Letter.)  Plaintiff has not proffered any evidence contradicting Ellenberger's opinion, or demonstrating that he suffered any adverse physical

---

[10] Specifically, Meisel noted that the paper upon which Plaintiff had submitted his appeal was two inches too long, in violation of § 2, ¶ 4.B of LCP's Inmate Grievances Policy of May 1, 2009 ("Inmate Grievances Policy") (ECF No. 55-5 at 4.).

[11] A "rejection," in the LCP grievance resolution system, signifies a procedural failure in the grievance itself, and grants the inmate leave to refile.  A "denial" is a determination that a grievance was meritless.  (Meisel Dep. 34.)

effects because the MRI was conducted in June.[12]

After the MRI, Plaintiff's pain did not abate.  Plaintiff's July 4, 2009 Sick Call Request stated that he was "still having headaches due to skull fracture."  (LCP Medical Records at 2.) Plaintiff has since been transferred to the custody of the Pennsylvania Department of Corrections, and currently resides at the State Correctional Institution in Coal Township, Pennsylvania.

### B.        Procedural History

Plaintiff filed a Complaint on June 30, 2009 (ECF No. 1), and subsequently amended that Complaint on two occasions.  The most recent version is the Second Amended Complaint, which seeks relief on a number of theories.  (ECF No. 29.)  Defendants filed Motions to Dismiss (ECF Nos. 30, 33), which were denied in part and granted in part (ECF No. 38).[13]  Following discovery, Defendants moved for summary judgment.  (ECF Nos. 55-58.)  Plaintiff filed a response with attached exhibits.  (ECF No. 61.)

Plaintiff seeks relief on several counts.  In Count I, Plaintiff claims that Bahnick, Von Kiel, and Meisel, in their individual capacities, violated his rights under the Eighth Amendment to the United States Constitution, and that he is therefore entitled to relief, including punitive damages, pursuant to 42 U.S.C. § 1983.  (Second Am. Compl. ¶¶ 43-52.)  In Count II, Plaintiff

---

[12] Plaintiff has submitted a letter from Richard I. Katz, M.D., which states that a "serious brain injury such as [that suffered by Plaintiff] raises the possibility of subsequent complications requiring clinical follow-up as well as follow-up imaging studies."  (Katz Letter.)   Dr. Katz did not refer to a specific time frame for follow-up imaging, nor did he suggest that any adverse effects could result from a failure to follow a particular time frame.

[13] We dismissed Plaintiff's claims in Count IV and Count VI against Defendant Meisel in our Order dated September 27, 2010.  (ECF No. 38.)  We dismissed Count IV in its entirety in the Order dated January 13, 2011, because Plaintiff failed to timely file a Certificate of Merit. (ECF No. 46.)

seeks relief from Lehigh County for similar violations.  (*Id*. ¶¶ 53-58.)  In Count III, Plaintiff

alleges that PrimeCare Medical Inc. is liable under the same theory advanced in Counts I and II

of his Complaint.  (*Id*. at ¶¶ 59-68.)  In Count V, Plaintiff alleges that PrimeCare is vicariously

liable for the negligence of its employees.[14]  (Second Am. Compl. ¶¶ 69-73.)  In Count VI,

Plaintiff seeks relief from Bahnick and Von Kiel for negligent infliction of emotional distress.

(*Id*. at ¶¶ 74-78.)

## II.   SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving

party may identify an absence of a genuine issue of material fact by showing the court that there

is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir.

2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific

facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting

that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of

materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is

---

[14] This vicarious liability theory is based on alleged negligence by Bahnick and Von Kiel.

some metaphysical doubt as to the material facts").  "Where the record taken as a whole could

not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for

trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary

judgment, courts must view facts and inferences in the light most favorable to the nonmoving

party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility

determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir.

1995).

## III.   DISCUSSION

### A.   Eighth Amendment Claim Against Bahnick, Von Kiel, and Meisel (Count I)

Defendants seek summary judgment on Plaintiff's claims in Count I that three

individuals, Bahnick, Von Kiel, and Meisel, violated Plaintiff's civil rights under the Eighth

Amendment to the United States Constitution.  (Meisel Mem. 6; PrimeCare Mem. 9.)  Plaintiff

argues that Defendants are not entitled to summary judgment.  (Pl.'s Resp. 12.)

#### 1.   Legal Standard

In order to prevail on a claim under 42 U.S.C. § 1983,[15] "a plaintiff must demonstrate that

the defendant, acting under color of state law, deprived him or her of a right secured by the

Constitution or the laws of the United States."  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d

---

[15] Section 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen
of the United States or other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the
party injured in an action at law, suit in equity, or other proper proceeding for redress.

Cir. 2006).  Plaintiff alleges that Defendants, in their individual capacities,[16] violated his right to be free from "cruel and unusual punishment," as guaranteed by the Eighth Amendment.[17] (Second Am. Compl. ¶¶ 44, 48.)  Specifically, Plaintiff argues that Defendants acted under the color of state law, and were deliberately indifferent to Plaintiff's "serious medical needs" by failing to provide Plaintiff with medications and timely care, and "deliberately preventing" Plaintiff from obtaining an MRI.  (*Id*. at ¶ 50.)

The Eighth Amendment requires prison officials to provide adequate medical treatment to inmates.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To prevail on a Section 1983 claim based upon an allegation of inadequate medical treatment, a plaintiff must establish that: (1) the medical need was serious; and (2) the acts or omissions by prison officials demonstrated "deliberate indifference" to the inmate's health or safety.  *Id*. at 104; West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978).  A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal citations omitted).

For behavior to qualify as deliberate indifference, an official must actually know of, and disregard, an excessive risk to the health of an inmate.  *Farmer v. Brennan*, 511 U.S. 825, 840

---

[16] Liability may be imposed against defendants in their personal capacities even if the violation of the plaintiff's federally protected right was not attributable to the enforcement of a governmental policy or practice.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.") (internal citation omitted).

[17] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. Amend. VIII.

(1994); *see also Baker v. Lehman*, 932 F.Supp. 666, 670 (E.D. Pa. 1996) (noting that the question is "whether the defendants were aware of facts from which they could draw the inference that a substantial risk of serious harm existed, and whether they drew that inference.") The subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. *In re Bayside Prison Litig.*, 341 F. App'x. 790, 796 (3d Cir. 2009). To prevail on the subjective element, plaintiff is required to do more than simply establish malpractice, or a professional "disagreement as to the proper treatment" for the underlying medical condition. *Lanzaro*, 834 F.2d at 346.

Where a plaintiff has received some type of medical care, "inadequacy or impropriety of the care that was not given will not support an Eighth Amendment claim." *Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) (citation omitted). Even though a medical condition may require surgery,[18] if the need for that surgery "does not appear to be acute, and the surgery is 'elective,' it is unlikely that a constitutional violation has occurred." *Hussmann v. Knauer*, No. 04-2776, 2005 WL 435231, at *3 (E.D. Pa. Feb. 22, 2005) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir. 1987)).

2.    *Medications Received by Plaintiff*

During the first four months of his incarceration at LCP, Plaintiff interacted with LCP medical staff regarding a number of medical issues. Most prominent among Plaintiff's problems

---

[18] We do not consider a follow-up MRI to be analogous to surgery, either in terms of seriousness, potential necessity, or invasiveness, but discuss this to point out that, under the controlling case law, only egregious deprivations of medical care implicate the Eighth Amendment.

were his severe headaches and dizziness, which were a lingering byproduct of the assault that he

had suffered.  Concurrent with these complaints was Plaintiff's demand for a follow-up MRI to

be conducted, in accordance with the Sacred Heart doctors' instructions following surgery.

We consider first Plaintiff's claim that Defendants failed, with deliberate indifference, to

provide him with Dilantin, the anti-seizure medication he was prescribed following his

emergency surgery, Defendant can not establish a cognizable claim for relief on this issue.  It has

not been established that Plaintiff had a "serious medical need," or in fact any medical need, for

Dilantin during the period in question.[19]  Although medical professionals had prescribed Dilantin

for Plaintiff, they had done so six months earlier as part of a planned anti-seizure regimen.

Sacred Heart doctors prescribed Dilantin as a purely prophylactic measure.  They noted that

Plaintiff himself had elected to take the medication prophylactically instead of waiting to see if

he would have a seizure without it, because Plaintiff has never had a seizure–either prior to or

since the surgery.[20]  (Sacred Heart Medical Records 00039.)  The doctors suggested that the

medication be taken for a period of six to twelve months; however, by the time Plaintiff entered

LCP, nearly six months had elapsed since this suggestion.  (*Id.*)  Simply because Dilantin might

have been an appropriate course of treatment in August of 2008, it does not necessarily mean that

it was an appropriate course of treatment after February of 2009.

There is no evidence of any "deliberate indifference" on the part of PrimeCare or its

employees.  PrimeCare and its employees catalogued, as best as they could given the limited

_____

[19] Following the surgery, it is possible that a regimen of Dilantin constituted a "serious
medical need" given Plaintiff's condition.   We are, however, in no position to evaluate that need
as of February 2009, and the parties do not provide us with any evidence with which to do so.

[20] Both options were "discussed in detail with [Plaintiff]" at Sacred Heart.  *Id*.

information Plaintiff offered, Plaintiff's prescription drug needs at his intake examination.  (LCP

Medical Records 14.)  Plaintiff did not identify Dilantin as one of his medications during that

examination, although he did mention that he had been prescribed an anti-seizure drug.  (*Id*.)

Plaintiff further indicated that he had been non-compliant with the prescription regimen, and had

last filled the prescription for Dilantin in August 2008.  (*Id*.)  Plaintiff's non-compliance meant

that PrimeCare and its employees were not being asked merely to not interrupt an ongoing course

of treatment; they were being asked essentially to initiate a new course of treatment.  Given the

inherent risks in initiating and discontinuing drug regimens, we cannot second-guess a conscious

medical decision to not place Plaintiff on a course of Dilantin.  The decision was made after

consideration of the material fact that Plaintiff had never executed the original treatment plan that

Sacred Heart doctors had proposed.  "While the distinction between deliberate indifference and

malpractice can be subtle, it is well established that as long as a physician exercises professional

judgment his behavior will not violate a prisoner's constitutional rights."  *Brown v.

Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).  Plaintiff's claim regarding the failure to

provide anti-seizure medication lacks merit.

Considering next Plaintiff's claim that he was deliberately denied appropriate pain

medication, we do not doubt that Plaintiff experienced pain during the period in question.

Plaintiff was, however, given pain medication to address his headaches.  At first, Plaintiff was

given acetaminophen, an over-the-counter pain medication.[21]  (LCP Medical Records 27.)  Later,

he was given Ultram, a different pain medication, to address his migraines.  (*Id*.)  We note that

during his intake examination, Plaintiff did not know which pain medications he was supposed to

_____

[21] This medication is referred to in the medical records by its trade name, Tylenol.

be taking.  (LCP Medical Records 9.)  There is no evidence to suggest that Plaintiff's condition

required stronger pain medication than the drugs provided to him.[22]  Indeed, Plaintiff was

requesting that his medications be "renew[ed]" and "continue[d]" as late as April 29, 2009.

(Pl.'s Resp. Ex. L.)  Furthermore, Plaintiff agrees that any gaps in the availability of pain

medication were quickly addressed.  (Foye Dep. 48.)

"Certainly no claim is stated when a doctor disagrees with the professional  judgment of

another doctor.  There may, for example, be several acceptable ways to treat an illness."  *White v.*

*Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) (emphasis omitted). We believe that the question of

which pain medication was appropriate falls squarely within the professional judgment of the

medical providers, and Plaintiff's complaint is no more than "a disagreement over the exact

contours of his medical treatment."  *Gause v. Diguglielmo*, 339 F. App'x. 132, 136 (3d Cir.

2009).  Such a disagreement is beyond the purview of this Court.  Plaintiff has provided no

evidence to support his claim that "deliberate indifference" characterized the decisions related to

his medical care at any point.  Plaintiff's claim is without merit.

       *3.*    *Plaintiff's Claim that He was Denied an MRI*

       a)    <u>"Serious medical need"</u>

With regard to Plaintiff's argument that Defendants deliberately prevented him "from

obtaining the follow-up neurological consult and MRI that he needed following his head injury,"

(Second Am. Compl. ¶ 50), we must first determine whether Plaintiff's request for an MRI

---

[22] In any case, Ultram is a relatively strong analgesic.  "Ultram (tramadol) is a narcotic-like pain reliever. Ultram is used to treat moderate to severe pain."  *McKnight v. Astrue*, No. 10-2126, 2011 WL 5026223, at \*24 n.58 (M.D. Pa. Oct. 21, 2011) (citing http://www.drugs.com/ultram.html).

constituted a "serious medical need".

The sole mention of the need for an MRI in Plaintiff's hospital records is a brief comment contained within the radiologist's report on August 25, 2008.  (Sacred Heart Medical Records 00160.)  The radiologist, Dr. Paul DuPont, recommended a 6-month follow-up to assess the state of Plaintiff's pineal gland.  (*Id*.)  The radiologist also suggested "further clinical correlation and follow-up" for an edema.  (*Id*.)  In the same set of documents, the neurosurgeon who oversaw Plaintiff's procedure recommended an MRI one month after the surgery.  (*Id*.)

While these recommendations constitute guideposts for future treatment, they do not, by themselves, amount to the factual delineation of a "serious medical need."  We noted the full scope of DuPont's recommendations because they appear to be suggestions for how Plaintiff and medical professionals should address the situation in the future.  They do not point to absolute medical necessities that "requir[e] treatment," or to situations that are "so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Lanzaro*, 834 F.2d at 347.  Furthermore, Defendants' medical expert has stated that "[n]othing in [Plaintiff's] clinical condition, such as new symptoms or change in consciousness or other neurologic deficit, indicated complications of the prior injury, surgery, or change in the pineal cyst."  (Ellenberger Letter.)  Plaintiff has offered no medical evidence to contest this statement, other than a physician's statement that he required follow-up imaging at an indeterminate point in the future.  (*See* Katz Letter.)  We do not see the seriousness and urgency in Plaintiff's request for an immediate MRI.  The record does not support such a description of his request.

It is true that Plaintiff repeatedly asked for an MRI to be conducted, utilizing the full range of administrative avenues available to him.  This does not answer the question of whether

the MRI constituted a "serious medical need."  There is no indication that an MRI–a radiological

exam to determine if the pineal gland was enlarged–was a treatment which could have alleviated

any of Plaintiff's symptoms.  It was recommended as a routine follow-up, and there is no reason

to believe that the six-month mark suggested for an MRI was a firm date, or that failure to

perform the MRI at the precise six-month anniversary of the surgery would have an adverse

effect on Plaintiff's health.  Plaintiff has offered no evidence to the contrary.

b)      <u>Defendants Bahnick and Von Kiel</u>

Although we are not convinced that Plaintiff's request for an MRI constituted a serious

medical need, we are certain that there exists no factual question as to whether Defendants

Bahnick and Von Kiel exhibited deliberate indifference towards Plaintiff's condition.  The

Supreme Court has stated that "an official must actually know of, and disregard, an excessive

risk to the health of an inmate," for his or her behavior to qualify as deliberate indifference.

*Farmer*, 511 U.S. at 829.

Plaintiff noted at his deposition that he was unable to explain why Bahnick was included

as a defendant.  (Foye Dep. 82.)  We cannot explain this either, and note that Plaintiff has failed

to allege specific facts which would demonstrate the existence of a genuine issue for trial with

regard to Bahnick.  There is little evidence to suggest that Bahnick had any meaningful role in

decisions regarding the scheduling of Plaintiff's MRI.  Any such decision seems to have required

the input of Von Kiel, the on-site physician.[23]  While Bahnick may have interacted with Plaintiff

occasionally, Plaintiff must demonstrate more than simple interactions.  Plaintiff has proffered no

---

[23] We point to the fact that it was Von Kiel's request to Napolitano, that Plaintiff be evaluated for an MRI, that seems to have prompted the actual test to be scheduled.  We do not believe that Von Kiel's involvement in the process necessarily justifies the claim against him.

evidence of Bahnick's deliberate indifference.  Indeed, he cannot even point to Bahnick's involvement in the process of determining whether and when Plaintiff should receive an MRI. Because there is no reason to believe that Bahnick knew of, and disregarded, any medical risk to Plaintiff, there is no outstanding issue of fact as to this claim.  Accordingly, we will grant summary judgment as to Plaintiff's claim against Bahnick.

Turning to Von Kiel's role in the providing of an MRI to Plaintiff, Von Kiel had, at various points, considered the question of Plaintiff's MRI.  On April 7, 2009, Von Kiel wrote that Plaintiff wanted an MRI, though he noted that this was one of his "many complaints."  (LCP Medical Records 13.)  Napolitano, the Physician Assistant who treated Plaintiff on June 10, 2009, noted that Von Kiel had requested that Plaintiff be evaluated for an MRI.  (*Id*. at 12.) Plaintiff admitted that Von Kiel had consistently told Plaintiff he would receive the MRI.  (Foye Dep. 86.)  The precise scheduling of the MRI was not unreasonable, nor did a delay of several months constitute deliberate indifference to Plaintiff's medical needs.  We are aware of no credible evidence that Von Kiel was aware of a risk to Plaintiff that would result from a short delay in scheduling an MRI, or that he disregarded such a risk.  Even as we view the facts in a light favorable to Plaintiff, as we are required to do, we cannot conclude that a reasonable trier of fact could determine that Von Kiel's actions exhibited deliberate indifference to Plaintiff's medical needs.  As such, Plaintiff's claim against Von Kiel must fail.

c)     Defendant Meisel

Plaintiff has also claimed that Defendant Dale Meisel, Warden of LCP, was responsible for Plaintiff's medical treatment and violated Plaintiff's constitutional rights.  (Second Am. Compl. ¶¶ 7, 50.)  Plaintiff argues, correctly, that Meisel "directly supervised and was personally

17

involved with" LCP's inmate grievance procedures.  (*Id*. at ¶ 8.)  Accordingly, Plaintiff claims, Meisel exhibited deliberate indifference towards Plaintiff's medical needs and consequently bears responsibility for the violation of his Eighth Amendment rights.  (*Id*. at ¶ 50.)  As evidence of this alleged indifference, Plaintiff cites Meisel's rejections of various inmate grievance forms that Plaintiff submitted over the course of several months.

Meisel, as LCP's chief administrator, has plenary authority over all areas of prison life, but this is not a basis on which to hold him responsible for delays in scheduling a medical procedure.  His rejection of Plaintiff's grievances on legitimate procedural grounds does not implicate the Eighth Amendment.  Plaintiff may have been frustrated that his grievance was rejected due to his failure to use the proper paper (Foye Dep. 70); however, LCP's enforcement of its established procedural rules simply does not amount to cruel and unusual punishment.

Furthermore, Meisel's intervention on behalf of Plaintiff contravenes the notion that he was deliberately indifferent to Plaintiff's concerns.  Meisel contacted Bahnick prior to rejecting Plaintiff's appeal, to determine the status of Plaintiff's request for an MRI.  (Pl.'s Resp. Ex. T; Meisel Dep. 52.)  Meisel's two rejections of Plaintiff's appealed grievances took place on June 11 and 22, 2009.  (Pl.'s Resp. Exs. P and R.)  During the period between these two rejections, prison officials scheduled, and Plaintiff received, the MRI which he claims that Meisel labored to deny him.  Plaintiff's substantive complaint–that he had not received an MRI–was addressed by prison officials, under Meisel's supervision, during this period.  This does not constitute deliberate indifference; it more closely resembles active engagement on Plaintiff's behalf.

There is no basis upon which to conclude that Meisel knew of and disregarded an excessive risk to Plaintiff's health needs.  Accordingly, Plaintiff's claim against Meisel lacks

merit.

### B.      Eighth Amendment Claims Against PrimeCare and Lehigh County

Plaintiff acknowledges that his Eighth Amendment claims against PrimeCare (Count II) and Lehigh County (Count III) cannot proceed under the same legal theory as his claims against the individual Defendants named in the Complaint.  (Pl's Resp. 19.)  The Supreme Court has stated that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  The theory of *respondeat superior* is an improper basis on which to hold a municipal defendant liable for the unconstitutional acts of its employees.  *Id.* at 691.  The same holds true for a private corporation acting under the color of state law or performing a municipal function.  *Connolly v. Oquendo*, No. 12-315, 2013 WL 4051320, at *3 (E.D. Pa. Aug. 9, 2013).  By providing medical services to prisoners and pretrial detainees at LCP, PrimeCare was acting under the color of state law for purposes of Section 1983.  *Id. at *2* (citing *West v. Atkins*, 487 U.S. 42, 54 (1988)).  Accordingly, PrimeCare cannot be vicariously liable for any unconstitutional acts of its employees.  *Id.* at *3.

Plaintiff can, however, prevail on a Section 1983 claim against these Defendants if he produces adequate "evidence that there was a relevant . . . policy or custom, and that the policy caused the constitutional violation" that he is alleging.  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 594 (3d Cir. 2003).  In order to succeed in a Section 1983 claim against them, Plaintiff must demonstrate that PrimeCare and Lehigh County pursued policies that caused a constitutional violation.

We note that a policy is made "when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy, or edict."

19

*Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law."  *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiff claims that Lehigh County and PrimeCare have violated LCP inmates' Eighth Amendment rights by "allowing technical formality to trump substance where serious medical needs are [at] stake."  (Pl.'s Resp. 20.)  In support of this contention, Plaintiff has submitted several grievances filed by other LCP inmates which purport to support the argument that PrimeCare, and Lehigh County, have pursued policies that violate the Constitution.  (*See* Pl.'s Resp. Exs. V-DD.)  According to Plaintiff, the enforcement of the prison's procedural requirements has denied or delayed inmates' receipt of "legitimate medical attention."  (*Id.*)

We have considered these grievance filings.  We see no pattern that suggests either PrimeCare or Lehigh County engaging in a grievance adjudication policy which in any way violates the Eighth Amendment's prohibition of cruel and unusual punishment.

By way of example, Plaintiff argues that a January 24, 2008 Grievance[24] was rejected because the inmate "had failed to fill out Inmate Request to Staff forms."  (Pl.'s Resp. 20; *see also id*. at Ex. V.)  The grievance in question was rejected, it appears, because the grievance was in the form of a letter to Defendant Bahnick.[25]  (Pl.'s Resp. Ex. V at 1.)  The Grievance Coordinator responded that the issue had to be addressed informally before the formal grievance process could begin, and suggested that the grievance be repurposed into a letter directly to

---

[24] Because identifying information has been deleted from the individual grievances, we will use dates and exhibit numbers to identify specific grievances.

[25] The Formal Grievance in question begins with "Dear Mrs. Josie Bahnick."

Bahnick.  (*Id*. at 2.)  This rule–requiring that informal avenues be exhausted before a formal grievance is filed–is clearly established in LCP's published policies.  (Inmate Grievances Policy 3.)  This reasonable procedural requirement is not designed to delay medical treatment.

We note that several grievances were rejected because the inmate failed to sign and date them (*see* Pl.'s Resp. Exs. X, Z), or because the inmate did not explain the informal attempts made to resolve the grievances (*see* Pl.'s Resp. Exs. Y, AA, BB, CC).  These requirements are also clearly stated in LCP's policies related to inmate grievances.  (Inmate Grievances Policy 3.)  We do not consider the requirement that inmates describe prior attempts to remedy a situation to be illegitimate, nor do we consider the procedural requirement to sign and date a complaint to be onerous.

All of the inmate grievances which Plaintiff submitted in support of his claim that PrimeCare and Lehigh County were pursuing an unconstitutional policy share a single characteristic:  they were rejected by prison administrators because the inmates failed to properly comply with clearly established rules.  Prison officials have a right to require that certain procedural requirements be satisfied.  Nevertheless, in many of these cases, prison officials responded to the substantive requests underlying the grievances even as they noted the grievances' procedural irregularities.  As Meisel stated in his deposition, the mere "fact that we reject a grievance doesn't mean that we actually ignore the underlying issue that the inmate raises."  (Meisel Dep. 51.)  Indeed, the record indicates that follow up related to the issues prisoners raised was not uncommon.

We further note that all of these claims deal with specific aspects of inmates' medical treatments.  We cannot agree that because one inmate claims to have received inadequate

21

treatment of a pimple (Ex. CC), or another inmate disagrees with medical professionals about his liver ammonia levels and corresponding need for a biopsy (Ex. W), there exists any evidence of unconstitutional policies.  Indeed, we have seen no evidence of any policy of deliberate indifference to inmates' serious medical needs in this record.  Rather, we believe that, at worst, the chronicled grievances describe situations in which inmates disagreed with their diagnoses or treatment plans, but those treatments were still well within the range of professional reasonableness.  In addition, we note that many of these grievances received substantive responses from prison officials.  Bahnick responded to the grievance found at Exhibit W with a detailed explanation that the treatment which the inmate sought–a biopsy on his liver–was unnecessary, and that he was already receiving proper medical attention for potentially heightened ammonia levels.  (Pl.'s Resp. Ex. W at 2.)  Meisel contacted Bahnick in regard to the grievances in Exhibits Y and CC, to determine the nature of the prisoners' ailments and how best to treat them.  (Pl.'s Resp. Exs. Y, CC.)

Accordingly, we find the allegation that the prison operates a grievance system which implicates the constitutional prohibition against cruel and unusual punishment to be meritless. There is simply no basis for Plaintiff's claim that an unconstitutional policy or custom exists.

Plaintiff's claims regarding any unconstitutional policy are purely conclusory.  Plaintiff adduces no meaningful evidence to support his claim that Lehigh County and PrimeCare have pursued or implemented any policies that violate the Eighth Amendment.  Even as we consider all facts in a light favorable to Plaintiff, there is no disputed issue of material fact related to these claims.  As such, Defendants PrimeCare and Lehigh County's Motions for Summary Judgment as to Counts II and III of Plaintiff's Second Amended Complaint will be granted.

### C.        Negligence Claim Against PrimeCare

Plaintiff has raised a negligence claim against PrimeCare (Count V), arguing that

PrimeCare is vicariously liable for its employees Bahnick and Von Kiel's negligence.  (Second

Am. Compl. ¶¶ 70-71.)  Defendant PrimeCare has moved for summary judgment, arguing that

"Plaintiff has failed to present the required evidence to support the underlying claim."

(PrimeCare Mem. 16.)

Plaintiff's Count IV claim against Defendants Bahnick and Von Kiel was dismissed

because Plaintiff failed to file a Certificate of Merit as required by Pennsylvania law.[26]  (ECF No.

46.)  Pennsylvania Rule of Civil Procedure 1042.3 requires that "[i]n any action based upon an

allegation that a licensed professional deviated from an acceptable professional standard," the

plaintiff must file a certificate of merit within sixty days after the filing of the complaint.  Pa. R.

Civ. P. 1042.3(a).

In claims that seek damages based on a theory of vicarious liability, additional certificates

must be filed as to each professional defendant for whose behavior a corporate defendant

allegedly bears vicarious liability.  *See Rostock v. Anzalone*, 904 A.2d 943, 946 (Pa. Super. Ct.

2006); *Stroud*, 546 F. Supp. 2d at 248.

Plaintiff has not submitted Certificates of Merit that speak to the alleged professional

negligence of Von Kiel, a Doctor of Osteopathy, or Bahnick, a Registered Nurse.  There exists no

---

[26] In federal district courts, the rule concerning Certificates of Merit "is substantive state law that must be applied."  *Booker v. United States*, 366 F. App'x 425, 426 (3d Cir. 2010); *see also Stroud v. Abington Mem. Hosp.*, 546 F. Supp. 2d 238, 248 (E.D. Pa. 2008) (noting that "[f]ederal courts in Pennsylvania have uniformly held that the [Certificate of Merit] requirement is a substantive rule of law that applies in professional liability actions proceeding in federal court").

legal basis pursuant to which Plaintiff's negligence claim against PrimeCare can proceed, and no

set of facts could permit Plaintiff's recovery on this state law negligence claim.  Accordingly,

Defendant's Motion for summary judgment as to Count V of the Second Amended Complaint

will be granted.

   **D.**     **Negligent Infliction of Emotional Distress Claim Against Bahnick and Von Kiel**

   Finally, we consider Plaintiff's claim found in Count VI of the Second Amended

Complaint, that Bahnick and Von Kiel[27] are liable for negligent infliction of emotional distress

upon Plaintiff.  (Second Am. Compl. ¶¶ 74-78.)  Plaintiff's Complaint alleges no specific facts to

support this claim.  Moreover, Plaintiff's response in opposition to Defendants' motions deals

with this issue in a brief footnote which is not enlightening.

   Accordingly, Plaintiff's negligent infliction of emotional distress claim must fail.

Plaintiff has offered no evidence of causation.  There is no disputed fact that, if resolved in

Plaintiff's favor at trial, would lead a trier of fact to conclude that his injuries are a result of a

breached duty.  Plaintiff claims that he "experienced dizziness, nausea, headaches, and constant

pain, all of which are sufficient physical manifestations of emotional distress for purposes of a

negligent infliction of emotional distress claim."  (Pl.'s Resp. 24 n.7.)  Based upon the totality of

Plaintiff's factual statements, the aforementioned symptoms resulted primarily from the lingering

effects of the August 13, 2008 assault and subsequent surgery.  There is no indication that

Plaintiff experienced these physical symptoms as a result of Defendants' actions, especially since

Plaintiff has not alleged, with even a scintilla of specificity, any causal connection between

---

[27] As we noted above, Plaintiff's Count VI claim against Meisel has been dismissed.

24

Defendants' actions and his alleged emotional distress.

Plaintiff, as the nonmoving party, "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  We do not believe that "the record taken as a whole could . . . lead a rational trier of fact" to find that Defendants' actions constituted the negligent infliction of emotional distress upon Plaintiff.  *Id*.  Accordingly, we will grant summary judgment in the Defendants' favor.

**IV.**     **CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment will be granted. An appropriate Order follows.

                                          **BY THE COURT:**

                                          **_____**
                                          **R. BARCLAY SURRICK, J.**

25